**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

THE ARAB AMERICAN CIVIL
RIGHTS LEAGUE ("ACRL"), *a
Michigan non-profit organization*,
NASSER BEYDOUN, JIHAD KAMAL
SAMHAT, KAREEM HASSAN JAMMOUL,
ABBAS HAMMOUD, RABAB HAMMOUD,
HUSSEIN HAMMOUD, AYAD
GHANDOUR, HASSAN RIDA HAMMOUD,
ALI MANOUN, HASSAN HAZIME, JANE
DOE 1, JANE DOE 2, JOHN DOE 1, JOHN
DOE 2, JOHN DOE 3, *and* JOHN DOE 4,
*individually and on behalf of all
Proposed Class Members, et al.*

     *Plaintiffs*,

     *vs.*

THE UNITED STATES SECRETARY
OF STATE, MARCO RUBIO, *in his
official capacity*, THE BOEING
COMPANY, THE LOCKHEED
MARTIN CORPORATION, *and*
CATERPILLAR, INC., *jointly and
severally,*

     *Defendants.*

Case No.

Hon.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

---

**CLASS ACTION COMPLAINT**

Plaintiff THE ARAB-AMERICAN CIVIL RIGHTS LEAGUE, along with the other named plaintiffs, individually and on behalf of all proposed class members, by and through their attorneys at AYAD LAW, PLLC, hereby complain the following:

**1** | P a g e

**TABLE OF CONTENTS**

INTRODUCTION………………………………………………….. 5

JURISDICTION…………………………………………………… 6

VENUE…………………………………………………………... 7

PARTIES………………………………………………………… 7

Plaintiffs………………………………………………………... 7

Defendants…………………………………………………….. 13

STATEMENT OF FACTS………………………………………… 14

Providing Assistance Despite "Credible Information" of Israeli
GVHRs is a Violation……………………………………………… 15

Israeli exceptionalism, special treatment, and selective non-
enforcement of the Leahy Law…………………………………... 17

Israel's Gross Violations of Human Rights in Lebanon………………. 26

Defendant The Boing Company……………………………………. 43

Defendant The Lockheed Martin Corporation………………………... 48

Defendant Caterpillar, Inc………………………………………... 51

CLASS ACTION ALLEGATIONS…………………………………... 56

COUNT I: Substantive failure to apply the Leahy Law (5 USC §
706(2)(A)) (As to United States Secretary of State)………………….. 58

COUNT II: Arbitrary and capricious procedures under the
Administrative Procedure Act (5 USC. § 706(2)(A)) (As to United
States Secretary of State)………………………………………… 59

COUNT III: Failure to perform non-discretionary duties under the
Leahy Law (5 USC. § 706(1)) (As to United States Secretary of State) 60

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

COUNT IV: Violation of the Equal Protection Component of the Fifth Amendment (As to United States Secretary of State)…………..  61

COUNT V: (Michigan Cause of Action) Negligent Entrustment (As to the Private Defendants)………………………………………..  63

COUNT VI: (Michigan Cause of Action) Negligence (As to the Private Defendants)…………………………………………………  66

COUNT VII: (Michigan Cause of Action) Gross Negligence (MCL 691.1407) (As to Private Defendants)…………………………………  66

COUNT VIII: (Michigan Cause of Action) Willful and Wanton Misconduct (As to Private Defendants)………………………………..  67

COUNT IX: (Michigan Cause of Action) Intentional Infliction of Emotional Distress (As to Private Defendants)………………………  67

COUNT X: (Michigan Cause of Action) Aiding and Abetting of Trespass to Land (As to Private Defendants)…………………………  69

COUNT XI: Injunctive Relief (As to all defendants)…………………  71

COUNT XII: Declaratory Relief (28 USC §§ 2201–2202) (As to all defendants)………………………………………………………..  71

RELIEF REQUESTED………………………………………………..  72

EXHIBIT A: MAP OF REGION……………………………………...  Attached

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**INTRODUCTION**

Israel has faced severe, widespread international condemnation from the United Nations, human rights organizations, and global governments for its military operations in Lebanon, which escalated significantly following the collapse of successive ceasefires in late 2024 and mid-2026.[1, 2, 3, 4, 5] The primary rebukes center on massive civilian displacement, violations of Lebanese sovereignty, and alleged war crimes. *Id.*

Plaintiffs are alleging the arbitrary and capricious disregarding and active thwarting of the Leahy Law by Defendant the United States government, as well as the negligent entrustment of weapons and demolition equipment and related claims against Defendants Boeing, Lockheed Martin, and Caterpillar. All claims are based on the transfer of instrumentalities to Israel, when Defendants knew or should have known that the Israeli entrustees were operating and would continue to operate the instrumentalities in a manner involving unreasonable risk of harm to the persons and property of the Plaintiffs, and which entrustment and subsequent manner of

---

[1] https://www.ohchr.org/en/press-releases/2026/04/un-experts-condemn-israels-unprecedented-bombing-lebanon-after-ceasefire

[2] https://dawnmena.org/lebanons-ceasefire-should-not-shield-israeli-crimes-from-accountability/

[3] https://www.ohchr.org/en/press-releases/2024/10/lebanon-un-experts-deplore-israels-increasing-disregard-international-law

[4] https://www.thehindu.com/news/international/israels-deadly-strikes-in-lebanon-spark-outrage-condemnation-from-rights-bodies/article70841634.ece

[5] https://www.jordannews.jo/Section-20/Middle-East/Aoun-Israeli-Attacks-Undermine-Diplomatic-Efforts-to-Stabilize-Lebanon-49006

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

operation was the actual, proximate, and foreseeable cause of harm to plaintiffs and their property.

Plaintiffs further argue that Defendants entrusted the instrumentalities to Israel when they knew that Israel was using them to commit gross violations of human rights (hereinafter "GVHRs"), when Israel bore an unreasonable risk of continuing to use them to commit GVHRs in Lebanon, and when Israel did subsequently use them, and now continues to use them, to commit GVHRs in Lebanon, and that Plaintiffs' harms were suffered precisely from attacks performed by Israel in connection with the commission of GVHRs enabled by Defendants' entrustment of instrumentalities to it. Plaintiffs continue to suffer the indefinitely prolonged threat of death and grievous bodily injury to themselves, their family and their communities, indefinitely prolonged property destruction and expropriation of their lawfully-held land, and acute mental and emotional suffering related to the same.

## JURISDICTION

1. Subject matter jurisdiction exists on diversity grounds because each named Plaintiff is diverse from each Defendant corporation, and the amount in controversy exceeds $75,000 as to each.

2. Personal jurisdiction exists over each Defendant because each has manufacturing operations, employees, business agreements, contracts, and other contacts rising to the level of purposeful availment within the state of Michigan. These contacts

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

are part of the business operations the negligent conduct of which Plaintiffs maintain are the proximate cause of injury in this case.

## VENUE

3. Venue is proper because Defendants' primary business contacts within the state of Michigan are located in the Eastern District of Michigan.

## PARTIES

### Plaintiffs

4. The ARAB-AMERICAN CIVIL RIGHTS LEAGUE ("ACRL") is a 501(c)(3) non-profit organization based out of Detroit, Michigan. Its members include several members of the Plaintiff class, including ACRL executive board members, who bring personal claims for the violations of their rights.

5. Plaintiff Nasser Beydoun is a US citizen. Nasser is a long-time member of board of directors of the ACRL. His family home in Bint Jbeil stood as a symbol of sacrifice, perseverance, and hope. His father spent more than 30 years working at Ford Motor Company, dedicating his life to providing for Nasser's family and saving enough to build the home he had always dreamed of returning to. Construction began in 2000 and was completed in 2006. Remarkably, the house survived three wars, standing strong through years of conflict. Yet, just days after a ceasefire was announced, Israeli forces deliberately destroyed his family home without any military necessity or justification. In a single moment, decades of hard work, cherished memories, and a lifetime of sacrifice were reduced to rubble,

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

leaving behind not only the loss of a building, but the destruction of a family's history and connection to its homeland.

6. Plaintiff Jihad Kamal Samhat is a US citizen. Jihad has personally worked in de-mining and Unexploded Ordnance ("UXO") matters for over fifteen years with the United Nations Mine Action Service ("UNMAS"), including in Lebanon. Jihad and his siblings inherited two properties, one from his late mother and one from his late father (both of whom were US citizens), both of which are situated in the Senasil neighborhood of Ainata, in the Bint Jbeil District of South Lebanon. Jihad and his family were living at the home inherited from his late mother. Plaintiff's family had long lived in this home. Jihad's uncle, Mohamed Hammoudi, also a US citizen and a former US federal employee, was killed in this home by an Israeli airstrike in the 2006 Lebanon War.[6] The home was subsequently rebuilt. In the wake of the October 7, 2023 Hamas attacks in Palestine, violent IDF attacks in the region of South Lebanon escalated dramatically, forcing Mr. Samhat and his family to evacuate and flee to California. Jihad Samhat returned to Ainata in May of 2025 to retrieve surviving legal documents, valuables, and family heirlooms. During that time, the home inherited from his mother had sustained damage but was still structurally sound. However, satellite imagery dated April 22, 2026 now shows the property has been

---

[6] His Heart Was Full for Lebanon and US - Los Angeles Times

completely reduced to rubble by IAF airstrikes. The same imagery appears to show that the property from his father is still standing. This second property remains under threat of an identical fate. Jihad and his family remain unable to return to, restore, or live upon either property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

7. Plaintiff Kareem Hassan Jammoul is a US citizen. Kareem has over 200 family members living in Lebanon. Many of Kareem's close relatives were killed in the past three years by IDF and IAF airstrikes and missile attacks. The remainder of these family members have been displaced and unable to return to their homes due to the strikes. In addition, Kareem owns and maintains multiple houses and apartments in Lebanon. In or around December of 2024, one of Kareem's buildings, in Mreijeh, in the Baabda District, in the densely civilian-populated southern suburbs of Beirut, was completely destroyed by an IAF bombing campaign. In or around March of 2026, a second of Kareem's buildings was likewise leveled during an IAF bombing campaign. The majority of the remainder of Kareem's property in Lebanon has been similarly destroyed and rendered uninhabitable by IDF action. Kareem and his family members remain unable to return to, restore, live upon, or use their property and live in constant fear of further injury and death caused by IDF and IAF strikes.

8. Plaintiffs Abbas Hammoud is a US citizen. His father, Nassim, passed away at 46 years-old. After his mother spent years raising them alone in a one-room

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

apartment, Abbas built a residence in Bint Jbeil, Lebanon and dedicated it to his father, Nassim. He placed a sign in Arabic in the front yard reading "This is the home of the beloved, Nassim Hammoud," in commemoration of their father. Abbas, his wife, and his 9-year-old son resided there, and his sister by the same parents, Rabab, and their mother stayed for long periods as well. On or around April 18, 2026, only days after the commencement of a putative ceasefire, Israeli ground forces entered his neighborhood on foot, surrounded his property, placed explosive charges around his home, and detonated them, completely destroying his property. Abbas' family, including his 9-year old son, were fortunately not in the structure at the time. IAF Airstrikes were then and are now being conducted in the area as well. Plaintiffs and their families remain unable to return to, restore, or live in their family home and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

9. Rabab Hammoud is a US citizen.  Rabab is Abbas Hammoud's sister and has suffered the same damages as he has.

10. Plaintiff Hussein Hammoud is a US citizen. Hussein owns property in Tayr Harfa, Tyre District, South Governorate, South Lebanon. His house had already been completely destroyed once before in earlier IAF strikes. Hussein and his family invested years of effort and expense between 2021 and 2023 to rebuild it. On or around January 11, 2025, the property, along with a 2018 Dodge Ram stored on-site, were completely destroyed in the course of an IAF strike. Hussein and his

**9 |** P a g e

family remain unable to return to, restore, or live upon the property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

11. Plaintiff Ayad Ghandour is a US citizen. Ayad has family and property in Nabatieh, Nabatieh al Fawqa, Rweis, near Ghandour hospital in Lebanon. On or around September 24, 2024 at 9:15am, the IAF dropped 2,000-lb bombs that demolished and leveled Ayad's three-story family house and decimated 4 acres of agricultural land. Ayad and his wife were displaced and remain unable to return to, restore, or live upon the property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

12. Plaintiff Abdulilah Hazimeh is a US citizen. Abdulilah holds property in Srebbine, Bint Jbeil District, Lebanon. On or about May 6, 2026, the IDF completely destroyed his family home. Abdulilah and his family remain unable to return to, restore, or live upon the property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

13. Hassan Rida Hammoud is a naturalized US citizen. Hassan built a new family house in the Jabbain area of Lebanon between 2021 and 2023, preparing it for use by him and his family. Due to the military hostilities, Hassan and his family were unable to access the home, which was to serve as the family's primary residence. On or about January 5, 2025, the new home was struck by a missile fired from an IAF aircraft and completely destroyed. Hassan and his family

members remain unable to return to, restore, or live upon the property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

14. Plaintiff Ali Manoun is a US citizen. Ali had property destroyed by the Israeli forces. Mr. Manoun and his family members remain unable to return to, restore, or live upon the property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

15. Plaintiff Hassan Hazime is a US citizen. Hassan had property destroyed by the Israeli defense forces. Mr. Hazime and his family members remain unable to return to, restore, or live upon the property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

16. Plaintiff Ahamd Alex Hijazi is a US citizen. Ahmad and his family-owned a large family home in Dibbine in Marjayoun, Lebanon, located at the coordinates: 33.361996, 35.601300. On or about May 29, 2026, the home and land were completely leveled by an Israeli bombing and land-clearing campaign. Ahmad and his family members remain unable to return to, restore, or live upon the property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

17. Plaintiff Jane Doe 1 is a US citizen. She and her family lived in Lebanon between 2006 and 2018. Jane Doe 1's father's tomb and their family home are situated in the village of Meis al Jabal in the Marjayoun District. They also maintain an apartment in Dohate el Doss. On or around February 21, 2025, their home in Meis

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

al Jabal was completely destroyed by Israeli military strikes. Jane Doe 1, her brother, her sister, and their family remain incapable of returning to, living in, or using their home. They remain in fear of further destruction of life and property, specifically the potential desecration of their father's final resting place and their as-yet undamaged apartment in Dohate el Doss. Their extended family of uncles, aunts, and cousins remain refugees under active threat in Lebanon. Plaintiff, her sister, and her brother live in constant fear of imminent injury or death caused by ongoing IDF and IAF strikes.

18. Plaintiff Jane Doe 2 is a US citizen. Jane Doe 2 is Plaintiff Jane Doe 1's sister and has suffered all of the same hardships as she has, inflicted by Defendants.

19. Plaintiff John Doe 2 is a US citizen. John Doe 2 is Plaintiff Jane Doe 1's brother and has suffered all of the same hardships as she has, inflicted by Defendants.

20. Plaintiff John Doe 1, as personal representative of the estate of Nemer Ali Beydoun, is a member of the ACRL board of directors. Nemer's home was destroyed after April 1, 2024 by Israeli forces, without any military necessity.

21. Plaintiff John Doe 2 is a US citizen. John Doe 1 was born and raised in Lebanon until the age of 18. John Doe 2's family home is situated in Bint Jbeil, in Haqourat Nass el Daya, close to the Great Mosque, in Lebanon. In 2006, IDF strikes completely destroyed his home. In 2009, his father rebuilt it. In 2011, his father passed the home on to him. John Doe 2 picked up the torch passed by his father and invested years of time, energy, effort, and expense into the property,

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F.: (313) 983-4665

including to install a solar system to ethically and responsibly sustain the home for future generations. John Doe 2 and his immediate and extended family members used the home as their living, gathering, and meeting place. On or around April 22, 2026, the IDF attacked the entire city center, including John Doe 2's family home, and reduced it all to rubble. John Doe 2 and his family remain unable to return to, restore, or live upon the property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

22. John Doe 4 is a naturalized US citizen. John Doe 4 owns land in Bint Jbeil, Lebanon, which he inherited from his father, and upon which he and his family had built a three-story family home. He also owned an apartment in Beirut. On or about November 26, 2024, the Beirut apartment was completely destroyed in an IAF bombing campaign. On or about July 10, 2026, the family home was completely destroyed by IDF military activity. John Doe 4 and his family members remain unable to return to, restore, or live upon the property and live in constant fear of imminent injury or death caused by IDF and IAF strikes.

## Defendants

23. Defendant MARCO RUBIO is the Secretary of State for the United States. He is sued in his official capacity only.

24. Defendant THE BOEING COMPANY (hereinafter "Boeing") is a corporation organized under the laws of the State of Delaware, with a principal place of

business at 929 Long Bridge Dr, Arlington, VA 22202. Boeing conducts substantial business throughout the United States, including the Eastern District of Michigan.[7]

25. Defendant LOCKHEED MARTIN CORPORATION (hereinafter "Lockheed") is a corporation organized and existing under the laws of the state of Maryland, with a principal place of business at 6801 Rockledge Dr, Bethesda, MD 20817. Lockheed conducts substantial business throughout the United States, including the Eastern District of Michigan.

26. Defendant CATERPILLAR INC. (hereinafter "Caterpillar") is a corporation organized and existing under the laws of Delaware, with a principal place of business at 5205 N. O'Connor Blvd. Ste 100, Irving, TX 75039. Caterpillar conducts substantial business throughout the United States, including the Eastern District of Michigan.

## STATEMENT OF FACTS

27. Within days of Hamas' October 7, 2023 attack on Israel, Israel's IDF ordered tens of thousands of troops to its border with Lebanon, with Israeli Defense Minister Yoav Gallant urging a broad preemptive strike into Lebanon.

28. Israeli ground forces advanced into Lebanon, ousting native landholders, destroying buildings, chemically poisoning agricultural land, and barring the

---

[7] KUOW - Off the Charts: Boeing was top US manufacturer of missiles and munitions delivered to Israel from 2021-2023

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

return of lawful titleholders, including Plaintiffs, by erecting barriers in Lebanese territory, issuing "shoot-on-sight" warnings to those attempting to return, and actually targeting and striking those who make such attempts.

29. Israel has used white phosphorus in towns, conducted bombing campaigns and air strikes against civilians, targeted journalists, humanitarian aid workers, ambulances, and health workers, issued displacement orders, and bulldozed entire towns in Lebanon. The scope and extremity of its incursion into Lebanon is grossly disproportionate to its claimed peace-keeping goals, and in line with genocide and a planned future settlement of Southern Lebanon.

30. IDF and IAF attacks in Lebanon have been systematically undertaken in a manner involving an unreasonable risk of harm to the person and property of others, including Plaintiffs, at all times since October 7, 2023.

**Providing Assistance Despite "Credible Information"
of Israeli GVHRs is a Violation**

31. The Leahy Law is a separate but complementary restriction within the Foreign Assistance Act of 1961, 22 USC. 2378d ("FAA"). The Leahy Law refers to two similar federal statutes – one applying to the State Department and one to the Department of War, at 22 USC. § 2378d and 10 USC. § 362, respectively. Both prohibit the United States from providing assistance to foreign military units for which there is credible information that they have committed Gross Violations of Human Rights ("GVHRs"). The State Leahy Law does so by prohibiting

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

assistance under the FAA or the Arms Export Control Act ("AECA") if the Secretary of State has credible information of GVHRs. The Defense Leahy Law applies similarly to the funds of the Department of War (DOW) under operation of the Secretary of Defense.

32. The prohibition is categorical: "**No** assistance shall be furnished" to such units, barring a determination and reporting that the country is taking effective steps to bring those units to justice. §2378d(a). The prohibition applies "if the Secretary of State has credible information" of GVHRs – not if and only if he or the President makes a determination of GVHRs.

33. Once the State "has credible information" of GVHRs, "**no** assistance shall be furnished," including assistance under the AECA. Both FMS and DCS-licensing fall under the purview of the AECA, therefore both are prohibited when the State has credible evidence that the recipient unit or units have committed GVHRs.

34. The only way for a military unit to resume receiving assistance after suspension is by remediation, in which the State determines that the foreign government "is taking effective steps to bring the responsible members of the security forces unit to justice." §2378d(b).

35. The State is required to maintain a list of all units receiving assistance and to seek to identify the unit involved when credible information of a GVHR exists. §2378d(d)(1) and (6). If it cannot determine which unit or units will receive the

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F.: (313) 983-4665

aid, it must maintain a list of prohibited units and receive written assurance from the recipient government that such units will not receive the assistance.

36. The DOW is prohibited by a parallel statute to the State's from assisting foreign military units for which there is credible information that they have committed GVHRs. "**None**" of the DOW funds may be used this way, and the DOW "**shall**" consult with the State to ensure that "full consideration" is given to "**any** credible information available to the Department of State relating to human rights violations." 10 USC § 362(a)(1) and (2).

37. In practice, therefore, implementation of both State and Defense Leahy Laws begins at the State in the "Leahy vetting" process. The State Department's Office of Security and Human Rights (SHR), within the Bureau of Democracy, Human Rights, and Labor (hereinafter "DHL"), acts as the lead contact for Leahy vetting policy and workflow issues. State is responsible for conducting Leahy vetting and provides its reports to the DOW for compliance.

38. The State gives broad scope to its interpretation of what constitutes a GVHR. The State Department generally considers "credible information" to be "a low evidentiary standard."[8] This may include reports procured through State or other departments, non-governmental organizations, non-profits, journalist and media sources, foreign government statements, etc.

---

[8] IF10575.10.pdf (Congressional Research Services)

**17 |** P a g e

**Israeli exceptionalism, special treatment, and selective
non-enforcement of the Leahy Law**

39. To effectuate review and processing of GVHR information for Israel, the State has established the Israel Leahy Vetting Forum (hereinafter "ILVF"), which met for the first time in 2020. The ILVF reviews reports of GVHRs committed by Israeli security force units and any steps the Israeli government has taken to investigate such incidents.

40. The State has abundant credible information that Israeli military units have committed GVHRs, including genocide. All of the concerns of Israeli GVHRs in Lebanon pleaded herein are a matter of long-standing public record.

41. Notwithstanding this information, the Secretary of State has flouted the Leahy Law prohibition on assistance by:

    a. Refusing or otherwise failing to suspend assistance to *any* Israeli security units as required under 22 USC. § 2378d(d)(a) – not a *single* Israeli military unit in history has had assistance suspended;

    b. Refusing or otherwise failing to vet Israeli recipient security force units prior to assistance as required under § 2378d(c)(1);

    c. Refusing or otherwise failing to update statutorily-required lists concerning the Israeli units receiving training, equipment, and other types of assistance as required under § 2378d(d)(1); and

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.

645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

d. Refusing or otherwise failing to seek to identify the unit or units involved in committing GVHRs for which it has credible information, but lacks the identity of, as required under 22 USC. § 2378d(d)(6).

42. Notwithstanding the fact that it has abundant credible information that Israeli security units were committing GVHRs (see the many citations of this complaint), the United States has not suspended assistance to a single Israeli unit. To the contrary, it has authorized, through FMS, DCS licensing, and other channels, abundant and ongoing assistance to Israel, including the FMS and DCS transactions pleaded with respect to defendants above, in violation of the FAA's Leahy Law requirements under 22 USC § 2378d.

43. According to a November 25, 2025 letter from Senator Chris Van Hollen to Secretary Rubio, a September 2025 OIG Report had found that Israeli military units had committed "many hundreds" of potential Leahy Law violations in Gaza since October 2023 and that completing a full review would require "multiple years." The OIG further found that the ILVF "involves higher-level US officials and a lengthier process than reviews for other countries" and that ILVF procedures allow reviews to "drag on, perhaps indefinitely." [9]

---

[9] https://www.vanhollen.senate.gov/imo/media/doc/11-25-2025_letter_to_rubio_on_state_oig_leahy_report.pdf; also reported in the Washington Post

44. Yet, special mechanisms in the ILVF subject Israel to a far more lenient, bureaucratic, and convoluted review process, to the point of rendering the Leahy Law non-enforced against Israel.

45. Senator Leahy himself remarked that the titular law "has not been applied consistently, and what we have seen in the West Bank and Gaza is a stark example of that."[10]

46. Another former state department official confirmed familiar with the ILVF stated that "[n]obody said it but everyone knew the rules were different for Israel." *Id*.

47. On September 30, 2024 five members of Congress addressed Secretaries Blinken and Austin to express their "deep alarm regarding the lack of US enforcement of the Leahy Law as it pertains to US assistance to Israel." Dozens of other members of Congress have publicly stated identical concerns.

48. **The Leahy Law is unenforced only against Israel as, unlike the vetting process for any other country, the ILVF arbitrarily requires periodic in-person meetings at a high official level, which slows the vetting process. Each succeeding step commonly involves even higher, senior-level Department and Embassy approvals of cables needed for the process, which causes further delay**.

---

[10] ['Different rules': special policies keep US supplying weapons to Israel despite alleged abuses | Israel | The Guardian](#)

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F.: (313) 983-4665

49. All parties involved in the ILVF reviews must reach a consensus that a potential violation occurred, which must then be approved by the Deputy Secretary of State. However, the Deputy Secretary of State has arbitrarily refused to sign such a consensus.[11]

50. Andrew Miller, the Deputy Assistant Secretary of State for Israeli-Palestinian Affairs from 2022 to 2024 wrote that this design meant the Law "was effectively suspended in Israel's case, even though the laws do not allow such exceptions."[12]

51. Upon information and belief, the September 2025 OIG Report (ISP-S-25-08) noted that the ILVF "involves higher-level US officials and a lengthier process than reviews for other countries" and allows reviews to drag on, perhaps indefinitely.[13]

52. Unlike the vetting process for any other country, even before the ILVF presents a recommendation to the Deputy Secretary of State to prohibit assistance for an abusive Israeli unit, ILVF procedures require a formal request to the Government of Israel *via* diplomatic note to respond to the allegations. This entails drafting, clearing, and delivering a written diplomatic note and demarche to Israel's Foreign Ministry, which consumes weeks if not months.

---

[11] See affidavit of Josh Paul, Exh. 1

[12] The End of the Israel Exception | Foreign Affairs

[13] The Review is now listed as classified, but its contents are described by a Senator's letter to the Secretary Blinken. Classified Review of the Department of State's Implementation of Leahy Non-Traceable Assistance Requirements | Office of Inspector General; 11-25-2025 Letter to Rubio on State OIG Leahy Report

**21** | P a g e

53. Thereafter, unlike the vetting procedures for any other country requiring a response within 14 days, ILVF written procedures permit up to 90 days before receiving a response from Israel. After Israel's response, the case returns to the ILVF for yet another in-person meeting to review the response.

54. The consensus requirement, mandatory in-person meetings, senior-level approvals, formal requests *via* diplomatic note, and so on **are afforded to no other nation's vetting forum**.

55. The combined effect of these unique affordances is the functional non-enforcement of the Leahy Law with respect to Israel. The policy implication of this is to completely invert the policy goals of the statutory framework by enabling a culture of impunity among Israeli security forces to commit GVHRs.

56. It was not until April of 2024 that the State and ILVF made a finding that Israeli military units had committed GVHRs, and in that case, Defendant Secretary of State said that each had already performed the remediation necessary to remain eligible for US assistance.[14]

57. Even when it did so, the State arbitrarily and capriciously allowed the units to remain eligible indefinitely even prior to establishing a path to remediation, rather than immediately suspending assistance pending full remediation. This sort of unprecedented leniency has again only been extended to Israeli units.

---

[14] US says Israeli army units violated human rights

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

58. Despite this information, the state has made zero findings of GVHRs committed by Israeli security forces since the inception of its wars in Gaza and Lebanon.[15]

59. The Government Accountability Office's April 2025 report "State Can Improve Response to Reports of Civilians Harmed by US Arms Transfers" documents selective Leahy Law enforcement.[16] Since 2021, the State Department has developed Leahy vetting forum processes for four countries receiving untraceable assistance: Israel, Ukraine, Egypt, and Jordan. As of February 2025, this process has identified 11 units in Ukraine, nine units in Jordan, and three units in Egypt as ineligible for US assistance based on their confirmed or suspected GVHRs. **Yet, in the entire 27-year history of the Leahy Law, the State Department has never found a single Israeli unit ineligible for assistance**.

60. The Government Accountability Office further found that the State received 617 civilian harm reports from Gaza between August 2023 and December 2024, most born of Israel's war in Gaza, but completed zero investigations into any of the deemed-credible reports.

61. As of April 2025, 473 reported incidents were pending without any review. External organizations have documented over 8,000 verified civilian harm

---

[15] US says Israeli army units violated human rights; the identified incidents took place before the war

[16] GAO-25-107077, HUMAN RIGHTS: State Can Improve Response to Allegations of Civilians Harmed by US Arms Transfers

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

incidents from this conflict during this period, yet the State's process arbitrarily accepts reports only from US government personnel and excludes external sources, despite the GAO recommended Defendant Secretary of State incorporate external allegations and develop adequate staffing. It rejected both recommendations.

62. High-ranking officials with personal knowledge of ILVF procedure have signed sworn statements in federal litigation in the United States to the following effect:

a. Josh Paul, who served as Director of the Office of Congressional and Public Affairs in the Bureau of Political-Military Affairs from 2012 to 2023 and participated officially in the ILVF, states that "the Leahy Law, as applied to Israel, including through the ILVF process, is applied (or not applied) in a manner that is unique, politicized, and, relative to all other applications of this law, both arbitrary and capricious." Mr. Paul attests that the ILVF reached consensus on "a number of incidents" meeting the standard for credible information of GVHRs, but that senior officials within the State Department "refused to sign off on the required Action Memorandum" to designate Israeli units ineligible for assistance. Mr. Paul further attests that the US Assistant Secretary of State who signed the untraceable assistance agreement with Israel "purposefully did so in a way that made it hard to read their name, due to discomfort with the text of the agreement" resulting from Israel's request that the agreement include

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

language stating Israel "has a robust, independent and effective legal system." Exhibit 1.

b. Charles O. Blaha, who served as Director of the Office of Security and Human Rights in the Bureau of Democracy, Human Rights, and Labor from 2016 to 2023 and was responsible for implementing the Leahy Law worldwide, stated that "[t]here is no other Leahy Law process like the ILVF for any other country in the world." Mr. Blaha attests that while Egypt, Jordan, and Ukraine also receive untraceable assistance, "the ineligibility determinations for those countries are made by action-level Leahy Law experts, approved at the bureau level, not by the Deputy or the Secretary." In contrast, the ILVF requires Deputy Secretary or Secretary approval for Israeli units. Mr. Blaha states that in his "seven and a half years of implementing the Leahy Law worldwide," he is "aware of no other country" protected by such an internal hurdle. Blaha concludes that "[t]he practical effect of requiring Cabinet-level approval for Israeli ineligibility findings is to create a political veto over what Congress intended to be a law and fact-based human rights determination." He states unequivocally: **"In effect, the State Department has suspended the application of the Leahy Law to Israel**, **even though the laws do not allow such exceptions**." Exhibit 2.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

63. The ILVF's less demanding standard for Israel, combined with the ILVF failure to find any Israeli unit ineligible, justify the inference that ILVF was created as an extra statutory favor for Israel, to violate the Leahy Laws.

64. The Leahy Law requires the Secretary to determine whether there is credible information that a unit has committed a GVHR and, if so, to prohibit assistance to that unit unless the government is taking effective steps to bring the responsible members to justice. 22 USC. § 2378d(a)-(b). Despite the OIG's finding of "many hundreds" of potential violations by Israeli units, and despite the State Department's own Annual Human Rights Reports documenting credible information of GVHRs by Israeli security forces every year since 1997, the Department has never once determined that an Israeli unit committed an unremediated GVHR. The April 2024 finding regarding five units was the first time the Department ever found that any Israeli unit had committed a GVHR at all, and the Department immediately found all five remediated. If the State Department were genuinely applying the Leahy Law to Israel, there would be a 27-year record of GVHR determinations and ineligibility findings. There is none.

65. The United States government's provision of security assistance to Israel despite possession of abundant credible information that its security forces have committed and are still committing GVHRs is in violation of the statutory requirements of the FAA's Leahy Laws, specifically 22 USC. § 2378d.

26 | Page

66. The Secretary of State's implementation of the ILVF, which functionally permits Israel to avoid statutorily-mandated vetting under the Leahy Laws, likewise renders the government's authorization of security assistance unlawful.

67. For the foregoing reasons, and claim that defendants' activities are somehow protected or privileged by the extension of a doctrine which depends on the lawfulness of an underlying governmental authorization must fail.

### Israel's Gross Violation of Human Rights in Lebanon

68. By December 2023, the Times of Israel related an Agence France-Presse tally of more than 140 Lebanese deaths, including more than a dozen civilians and three journalists.[17] The UN Assistant Secretary-General Khaled Khiari noted a rising number of civilian casualties, and cited Israeli settler violence in Lebanon as "a grave concern" that "continues at high levels."[18]

69. As of December 11, 2023, the Washington Post reported Israel had used white phosphorus more than 60 times on Lebanon's border, an act prohibited by international law and subject to investigation as a war crime.[19]

70. On March 27, 2024, an Israeli airstrike targeted a paramedic center and killed seven volunteer paramedics. Later in the same day, further IAF airstrikes in Tayr

---

[17] Report: IAF was airborne for preemptive Hezbollah hit when Biden talked PM out of it | The Times of Israel

[18] "The risk of regional spillover" of conflict in Middle East remains high, ASG Khiari tells Security Council | Department of Political and Peacebuilding Affairs

[19] Israel used US-made white phosphorus weapons in South Lebanon attack - The Washington Post

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

Harfa killed two additional paramedics, and killed yet another in Naqoura. Human Rights Watch declared the incident an unlawful attack on civilians and reported that there was no evidence of non-civilian targets at the sites.[20] Metal fragments from the site confirmed the use of Boeing-manufactured JDAM kits.[21]

71. On August 25, 2024, Israel launched preemptive airstrikes with more than 100 fighter jets on 40 locations in southern Lebanon.[22]

72. On September 17 and 18, 2024, Israel remotely exploded thousands of pagers, beepers, and walkie-talkies across Lebanon. The Lebanese government stated that these attacks injured some 4,000 civilians and killed 40.[23] The UN Special Coordinator for Lebanon, Jeanine Hennis-Plasschaert, remarked that the explosions were an "extremely concerning escalation," confirmed that Israel had killed children in the attack, and urged adherence to international humanitarian law.[24] Human Rights Watch described it as "an indiscriminate attack that violated the prohibition on the use of booby traps under customary international humanitarian law."[25] UN High Commissioner for Human Rights Volker Türk

---

[20] Human Rights Watch says Israel attack on Lebanon rescuers was unlawful | Arab News
[21] Human Rights Watch says Israel attack on Lebanon rescuers was unlawful | Arab News
[22] CBP-10108.pdf; Mapping the 25 August Israel and Hezbollah attacks | ACLED Insight | ACLED
[23] Netanyahu confirms he okayed Lebanon pager attacks that killed 40 and injured 3,000 people | The Independent; Lebanon files complaint against Israel at UN labour body over pager attacks | Israel attacks Lebanon News | Al Jazeera
[24] Statement of UN Special Coordinator Jeanine Hennis-Plasschaert on Attack in Lebanon | Department of Political and Peacebuilding Affairs
[25] World Report 2025: Lebanon | Human Rights Watch

stated that "[s]imultaneous targeting of thousands of individuals, whether civilians or members of armed groups, without knowledge as to who was in possession of the targeted devices, their location, and their surroundings at the time of the attack, violates international human rights law and, to the extent applicable, international humanitarian law"[26]

73. On September 23, 2024, five days after the pager attacks, Israel began a series of airstrikes in Lebanon in an operation code-named Northern Arrows. **The airstrikes killed 50 children and hundreds of adults**.[27] Lebanese PM Najib Mikati described the attacks as a "war of extermination" and pleaded with the United Nations to deter Israeli aggression, warning that Israel was planning to "destroy Lebanese villages and towns." [28] He proved to be right.

74. In October 2024, Israel commenced its ground invasion into southern Lebanon. On October 4, 2024, **the IAF struck the main Lebanon-Syria border crossing as civilians were trying to flee**, and in clear disruption of humanitarian operations. Human Rights Watch documented three more attacks in which the IDF unlawfully struck medical personnel, transports, and facilities, including paramedics in central Beirut, an ambulance, and a hospital, killing 14 paramedics in the process.

---

[26] Exploding Pager Attacks in Lebanon: Your Questions, Answered
[27] World Report 2025: Lebanon | Human Rights Watch
[28] Lebanon PM slams Israel's 'war of extermination' as death toll from strikes rises to 274 - World News

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

75.In addition, United Nations Secretary-General António Guterres joined foreign ministers from countries including China, France, Italy, Indonesia, and Turkey, as well as human rights organizations around the world, in condemning Israeli attacks on UN personnel in southern Lebanon after **two Indonesian UN peacekeepers were targeted and wounded by Israeli tank fire**.[29]

76.Human Rights Watch verified further attacks using Boeing-produced JDAM kits in strikes that **killed three journalists in the Lebanese town of Hasbaya**, in what was "most likely a deliberate attack on civilians and an apparent war crime."[30]

77.A World Bank study near this time **documents the destruction of at least 100,000 homes**.[31]

78.On October 16, 2024, **Amnesty International reported that the IDF fired white phosphorus, a deadly chemical weapon, into Dhayra, striking civilian targets**.

79.Amnesty International's Deputy Regional Director for the Middle East and North Africa, Aya Majzoub, described it as a violation of international law that needed

[29] 'Intolerable': Global Outrage as Israeli Forces Fire on UN Peacekeepers in Lebanon | Common Dreams
[30] World Report 2025: Lebanon | Human Rights Watch
[31] New World Bank Report Assesses Impact of Conflict on Lebanon's Economy and Key Sectors

to be investigated as a war crime. [32] The white phosphorus was supplied by the United States.[33]

80. On October 25, 2024, **an IAF airstrike killed three journalists** and injured four others in what Human Rights Watch described as "most likely **a deliberate attack on civilians and an apparent war crime**."[34] The same facility was struck again in March of 2026.

81. On December 12, 2024, Amnesty International published an article concerning four separate air strikes by the IAF against Lebanese targets on September 29, October 14, October 16, and October 21, 2024. The strikes were without forewarning, **killed at least 49 civilians, decimated entire families**, and were "emblematic of Israel's shocking disregard for civilian lives in Lebanon and their willingness to flout international law," per Amnesty International's Erika Guevara Rosas, Senior Director for Research, Advocacy, Policy and Campaigns.[35]

---

[32] Evidence of Israel's unlawful use of white phosphorus in southern Lebanon as cross-border hostilities escalate

[33] Israel used US-made white phosphorus weapons in South Lebanon attack - The Washington Post

[34] Lebanon: US Arms Used in Israeli Strike on Journalists | Human Rights Watch. The owner of the facility which suffered the attack and an identical one later is a named Plaintiff.

[35] Lebanon: Israeli air strikes that killed at least 49 civilians further evidence of war crimes - Amnesty International

82. **Aline, a five-month old baby, became the youngest of the confirmed civilian deaths in these strikes when her body was flung out of her home into a pickup truck nearby**. *Id*.

83. Amnesty International found no evidence of any military target in the September 29 or October 16 strikes. Fragments from one strike confirmed the use of bombs for which United States manufacturing is the "primary supplier." Senior Director Rosas called for the suspension of arms transfers to Israel in light of Israel's "appalling track record of carrying out unlawful air strikes" with a "devastating toll on civilians." *Id*.

84. On November 10, 2024, an Israeli attack in the Aalmat village region north of Beirut killed **23 people, including seven children**.[36] In the same month, more than 20 human rights organizations called on Lebanon and United Nations member states to convene a special session at the UN Human Rights Council to establish an international investigation into human rights violations in Lebanon.[37]

85. A January 16, 2025 article drawing from *World Report 2025* by Human Rights Watch noted "**scores of apparent war crimes and laws of war violations" with "devastating impacts on civilians in Lebanon**."[38] (Emphasis added.)

---

[36] [Netanyahu confirms he okayed Lebanon pager attacks that killed 40 and injured 3,000 people | The Independent](#)

[37] [World Report 2025: Lebanon | Human Rights Watch](#)

[38] [Lebanon: Hostilities Wreak Havoc on Civilians | Human Rights Watch](#)

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

86. **According to the report, more than one million people were displaced, thousands of homes were destroyed, and entire villages were reduced to rubble**. *Id*.

87. The report recommended that the United States "should suspend weapons transfers to Israel because of the Israeli military's repeated, unlawful attacks on civilians," and encouraged Lebanon to take the issue up with the International Criminal Court (ICC). *Id*.

88. On November 26, 2024, the sides entered into a putative 60-day ceasefire. The following day, thousands of displaced Lebanese citizens began to return to their homes based on the ceasefire's assurance that they would be safe.[39]

89. The November 2024 ceasefire had set a deadline for removal of the IDF from southern Lebanon by late January 2025, but Israeli forces remained past the deadline because they needed more time to destroy Lebanese infrastructure. *Id*.

90. **Those IDF forces then killed 22 and injured 124 after firing "warning shots" at Lebanese residents attempting to return to their homes**.[40]

91. The ceasefire terms were renegotiated successively and with poor stability. The UN observed that **between the date the ceasefire came into effect on**

---

[39] Israel-Hezbollah cease-fire: Displaced Lebanese begin to head home as guns, bombs fall silent - UPI.com

[40] Lebanon ceasefire: 15 reported killed by Israeli forces after withdrawal deadline missed

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**November 27, 2024 and November 24, 2025, Israeli military attacks killed at least 127 civilians**.[41]

92. One such attack killed 13 civilians, including **eight children**, and injured six more civilians, in a strike in which zero documented deaths were non-civilian, "raising serious concerns that the Israeli military's attack may have violated international humanitarian law principles on the conduct of hostilities." *Id*.

93. Thameen Al-Kheetan, spokesperson for the UN High Commissioner for Human Rights, stated "we continue to witness increasing attacks by the Israeli military, resulting in the killing of civilians and destruction of civilian objects in Lebanon, coupled with alarming threats of a wider, intensified offensive."[42]

94. Human Rights Watch stated that "**repeated attacks on reconstruction-related equipment and other civilian facilities in southern Lebanon throughout 2025 violate[d] the laws of war and are apparent war crimes**."[43] (Emphasis added.) Human Rights Watch found no evidence of military targets in or around the sites in question.

95. Lebanese land-owners attempting to return to their land and clear rubble and roads have been deliberately targeted, paralyzing any reconstruction efforts and indefinitely exiling the owners from their own homes under threat of death from

---

[41] Increasing Israeli attacks killing civilians in Lebanon | OHCHR
[42] Increasing Israeli attacks killing civilians in Lebanon | OHCHR
[43] Lebanon: Israel Unlawfully Destroying Reconstruction Equipment | Human Rights Watch

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

an Israeli military strike. UN High Commissioner Al-Kheetan confirmed that these targeted activities "severely hampered reconstruction efforts and attempts by internally displaced people to go back to their homes." *Id*.

96. **Israeli has constructed a wall, with Caterpillar bulldozers, extending into Lebanese territory, making it inaccessible to lawful owners, including Plaintiffs**. *Id*.

97. This, in combination with the wholesale razing of entire towns and targeted strikes against reconstruction vehicles jeopardizes "people's right to return to their lands."[44]

98. An extensive Amnesty International briefing titled *Nowhere to Return: Israel's Extensive Destruction of Southern Lebanon*, documents the IDF's systematic use of airstrikes, manual explosives, and Defendant Caterpillar's bulldozers to devastate civilian structures across 24 municipalities.[45] The briefing reveals that between October 1, 2024, and January 26, 2025, more than 10,000 structures were destroyed, much of which destruction took place after the November 2024 ceasefire.

99. International humanitarian law prohibits the destruction of civilian property barring an imperative military necessity, prompting Amnesty's Senior Director Erika Guevara Rosas to remark:

[44] Increasing Israeli attacks killing civilians in Lebanon | OHCHR
[45] 25.08.26 BRIEFING ISRAELI DESTRUCTION LEBANON.pdf

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

> The Israeli military's destruction of civilian homes, property and land in southern Lebanon rendered entire areas uninhabitable and ruined countless lives. The evidence we have analysed clearly shows that Israeli troops deliberately left a trail of devastation as they moved through the region. Their blatant disregard for the communities they have destroyed is abhorrent. Where these acts of destruction were committed intentionally or recklessly, they must be investigated as war crimes.[46]

100. **More than 70% of the buildings in Yarin, Dhayra, and Boustane in Tyre District were destroyed in this time, with seven other municipalities having had more than half of their structures destroyed**. Israel destroyed cemeteries, gardens, agricultural land, and places of worship.[47]

101. On February 5, 2026, Lebanese officials reported that Israel conducted an extensive aerial operation in which it **released carcinogenic glyphosate over Lebanese lands**, to make barren any farmland underneath. Officials described the operation as part of a broader "scorched earth" effort, in combination with white phosphorus, burnt farmland, heavy metal poisoning, and unexploded ordnances.[48] UN peacekeepers said this was not the first time Israeli aircraft dropped chemical substances over Lebanon.

---

[46] Lebanon: Israeli military's deliberate destruction of civilian property and land 'must be investigated as war crimes' - Amnesty International

[47] Lebanon: Israeli military's deliberate destruction of civilian property and land 'must be investigated as war crimes' - Amnesty International

[48] Israel accused of spraying cancer-linked herbicide on farms in southern Lebanon | Lebanon | The Guardian; Lebanon says Israel sprayed southern villages with concentrated herbicide

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

102.   On March 2, 2026, full-scale IAF airstrikes resumed, and on March 3, 2026, the ground operations recommenced. **The scale and pace of town and village destruction and concomitant GVHRs have accelerated**. The IDF has issued displacement orders under threat that it "will not hesitate to target anyone who is present" near what it classifies as Hezbollah facilities – which under its present rules of engagement includes virtually everything south of the Litani river in Lebanon, and even large parts of Beirut. Israeli leadership have explicitly called for the acceleration of the demolition of houses in border villages.[49]

103.   On March 31, 2026, **Israeli Defence Minister Israel Katz reiterated plans to destroy "all homes" in southern Lebanon and not allow the local population to return**. He stated the IDF's plan was to maintain control "over the entire area up to the Litani River," that "all houses in villages near the Lebanese border will be destroyed, in accordance with the model used in [. . .] Gaza."

104.   Tom Dannenbaum, law professor at Stanford Law School, said the prohibition of residents returning to their homes "strongly indicate[s] an illegal policy of long-term or permanent displacement."

105.   On April 8, 2026, the IAF struck dense civilian residential areas in central Beirut without warning, **killing at least 254 and wounding 1,165**.[50] Israeli

---

[49] Israeli Officials Signal Stepped-Up Atrocities in Lebanon | Human Rights Watch
[50] Israeli attacks across Lebanon kill at least 254 after Iran-US ceasefire | US-Israel war on Iran News | Al Jazeera

Defence Minister Israel Katz remarked that it was a "surprise strike," with the IDF simultaneously admitting that "most of the infrastructure that was struck was located within the heart of the civilian population."[51]

106. A group of UN special rapporteurs condemned the attacks as "illegal aggression," "indiscriminate bombing," "a blatant violation of the UN charter," and "**not self-defence**."[52] The independent experts concluded the attack exhibits "continuing utmost contempt for the international legal order, for diplomacy, and above all for the lives of civilians and the environment in Lebanon." They further reported that the strikes on residential areas released toxic pollutants, contaminated water, and were in violation of international humanitarian law.

107. On April 22, 2026, **a civilian reporter bled out and died as Israeli forces denied rescuers, including the Red Cross, permission to rescue her**. The reporter was trapped in rubble after three successive IAF strikes destroyed: the car in front of her, the car she was in, and the building she was subsequently taking shelter in which then collapsed.[53] The Committee to Protect Journalists noted "[t]his isn't the first time" Israel has stopped emergency services from rescuing journalists its strikes injured, in an "abhorrent" way and in "blatant

---

[51] Israel says 60-second strike killed 250 Hezbollah operatives in Lebanon | Fox News; Israeli attacks across Lebanon kill at least 254 after Iran-US ceasefire | US-Israel war on Iran News | Al Jazeera

[52] UN experts condemn Israel's unprecedented bombing in Lebanon after ceasefire announcement, demand immediate halt to hostilities | OHCHR

[53] An airstrike trapped a journalist. She died as rescuers waited for permission to save her. - The Washington Post

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

disregard" for international law. The attack and subsequent denial of medical access have been described as war crimes under the Geneva Convention according to several human rights and press freedom organizations who condemned the attack.

108.   On June 7, 2026, the IAF struck a densely populated civilian neighborhood, killing at least two and injuring eleven, **despite a ceasefire**.[54]

109.   On June 14, 2026, the IAF again struck dense urban civilian neighborhoods in Beirut, killing at least three and injuring others, **despite a ceasefire**. The UN Secretary General Antonio Guterres strongly condemned the strikes and specifically observed Israel's violation of the ceasefire.

110.   **Also on June 14, 2026, Israel issued a further 29 forced displacement orders for 29 locations in Lebanon**.[55] **According to UN experts, "forced displacement of a civilian population constitutes crimes against humanity and is a war crime under international law**.[56]

111.   Also on June 14, 2026, Lebanon formally lodged a complaint with the UN Security Council against Israel for violating the Chemical Weapons Convention, reporting that after Israeli aerial chemical drops, farmlands showed glyphosate

---

[54] Israel hits civilian area in Beirut's southern suburbs, kills at least two | Israel attacks Lebanon News | Al Jazeera
[55] At least three killed as Israel attacks southern Beirut | Israel attacks Lebanon News | Al Jazeera
[56] UN experts condemn Israel's unprecedented bombing in Lebanon after ceasefire announcement, demand immediate halt to hostilities | OHCHR

levels at 22,750 mcg/g—when anything over 3 mcg/g is considered unsafe. The complaint alleged that Israeli chemical attacks form part of a concerted effort to preclude Lebanese landowners from returning to their land and rebuilding their farms.[57]

112. On June 15, 2026, following the announcement of a bilateral peace deal between the United States and Iran which would reportedly require a commitment to end hostilities in Lebanon, **Israeli Defence Minister Israel Katz rebuked the agreement and stated that the IDF would remain in Lebanon "without any time limit," vowing that the occupied zones will be "cleared of local residents," that the houses "will be destroyed**."[58]

113. On June 16, 2026, President Trump, in response to Israeli attacks that seemed deliberately designed to frustrate the nascent peace deal between the United States and Iran, which is conditioned on Israeli withdrawal and re-instatement of the territorial sovereignty of Lebanon, made public remarks admitting that Israel's attacks target civilian-rich buildings: "**You don't have to knock down an apartment house every time you're looking for somebody, because there**

---

[57] [DRAFTING NOTE – double check sources?]]Lebanon complains to Security Council over alleged Israeli use of herbicide; Lebanon Accuses Israel Of Violating The Chemical Weapons Convention By Spraying Toxic Herbicide Over Farmland | The Most Revolutionary Act; https://today.lorientlejour.com/article/1538170/lebanon-files-complaint-against-israel-with-security-council-over-glyphosate-spraying-and-soldiers-killed.html.
[58] Ministers say Israel won't be bound by Iran deal, as opposition castigates Netanyahu's 'absolute failure' | The Times of Israel

**40 |** P a g e

**are a lot of people in those apartment houses, and they're not all Hezbollah."**[59]

114. On June 19, 2026, **Israeli Security Minister Itamar Ben Gvir stated in a social media post that "all of Lebanon must burn."**[60]

115. On June 19, 2026, hours after the announcement of the prospective truce between the United States and Iran was shared by major news organizations, Israel blatantly violated a ceasefire agreement in Lebanon when its artillery bombarded Lebanon, killing 47 in what many believe was a militarily-unnecessary, politically motivated, attack by Israel intended only to derail the US-Iran peace effort, as Iran has repeatedly raised the issue of Israel's aggression in Lebanon.[61]

116. Israel does nothing to rein in their out of control soldiers. Reporters Without Borders (RSF) and other media outlets have claimed that the IDF deliberately

---

[59] Trump criticizes Israel's tactics in Lebanon, says it is killing civilians | Reuters

[60] Ben Gvir says 'all of Lebanon must burn' after Hezbollah kills four soldiers | The Times of Israel; 'All of Lebanon must burn,' Israeli minister says after IDF reports four soldiers killed | Euronews; Israel Lebanon Conflict: All of Lebanon Must Burn Row. On May 20, 2026, Israeli forces detain activists of a peaceful flotilla attempting to deliver humanitarian aid to Gaza. Ben Gvir is seen on video smiling at and taunting detained activists who are bound, forcefully handled by their necks and arms, roughly mandhandled, and made to kneel hunched over in cramped rows. Italian PM Giorgia Meloni called the incident "unacceptable." South Korean President Lee Jae Myung called the actions "way out of line." Spain and Ireland called it "monstrous" and "appalling," and the Trump administration called it "despicable." Turkey called the naval interdiction of the flotilla 167 miles out from the Gaza coastline an act of "piracy."

[61] Israel and Hezbollah agree to halt fighting, officials say | AP News

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

targeted journalists.[62] In one instance, an Israeli tank fired two rounds at a group of "clearly identifiable journalists" in violation of international law, as investigated by the UN and reported by Reuters, whose journalist was killed in the strike.[63] Six other journalists were wounded.

117. Since the commencement of the IDF ground incursion, IDF forces have also been documented systematically demolishing not just homes but entire Lebanese towns and villages, both by the use of industrial construction equipment such as heavy tractors and through the use of shaped explosives and converted anti-tank mines.[64] The Israeli Defence Minister has explicitly called for the demolition of "all houses" in the near-border area of Lebanon. These actions have raised widespread international concern, with a body of rights activists and academics decrying it as "domicide" – the systematic destruction of civilian housing to render entire areas uninhabitable.

118. As further evidence of Israel's GVHRs in Lebanon, on September 16, 2025, the UN Commission of Inquiry concluded, that **Israeli forces have committed and are continuing to commit genocide** in Gaza and the West Bank.[65, 66]

---

[62] RSF video investigation into the death of Reuters reporter Issam Abdallah in Lebanon: the journalists' vehicle was explicitly targeted | RSF; Israeli attack in southern Lebanon kills journalist, wounds several others | Israel-Palestine conflict News | Al Jazeera
[63] Israeli tank strike killed 'clearly identifiable' Reuters reporter - UN report | Reuters
[64] 'Everything is gone': Israel destroys entire villages in Lebanon | Lebanon | The Guardian
[65] a-hrc-60-crp-3.pdf
[66] Credible information of every range of human rights abuse and violation of international law with respect to Gaza and Palestinians is too numerous to begin recounting within the constraints

**AYAD LAW, P.L.L.C.**
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

119. All of the foregoing comprises only a sample of highlighted instances for which there is substantial, public, credible information that the Israeli military has been, is now, and has a strong probability to continue committing GVHRs in Lebanon.

### Defendant The Boeing Company

120. Boeing's provision of defense articles to Israeli security forces is a matter of past fact and, barring any disruption, of future certainty.

121. Boeing is the largest supplier of munitions by volume to Israel. Boeing produced the majority of guided bombs and missiles delivered to Israel between 2021 and 2023, including Joint Direct Attack Munition (hereinafter "JDAM") precision-guided bomb kits, Small Diameter Bombs (hereinafter "SDBs"), refueling aircraft, and F-15 fighter aircraft.[67]

122. In March of 2020, Boeing contracted to supply refueling aircraft, engines, and related parts and services to Isreal in a $2.4 billion agreement. [68]

123. In August of 2024, Boeing was contracted to provide up to fifty (50) F-15 and F-15IA aircraft per an $18.832 billion agreement. While much of the contracted-for munitions have been provided already, the first of the F-15IA fighters is not

---

of this pleading. Plaintiffs would be happy to provide supplemental pleading to this end as requested by the court. Plaintiffs wish to o

[67] KUOW - Off the Charts: Boeing was top US manufacturer of missiles and munitions delivered to Israel from 2021-2023

[68] Defense Security Cooperation Agency

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

expected to arrive until 2029, according to the Defense Security Cooperation Agency (DSCA) release. The agreement includes eight years of ongoing service and program support on-site in Israel, with work expected to continue through December 2035. [69],[70],[71]

124. On February 7, 2025, Boeing became the principal contractor of a $6.75 bn sale of JDAMS, small diameter bombs (SDBs), general purpose bomb bodies, fuzes, and related support to Israel. [72]

125. On February 28, 2025, Boeing became the principal contractor for a $675.7mn sale of JDAMs, bomb bodies, and related support to Israel.[73]

126. On June 30, 2025, Boeing became the principal contractor for a $510mn dollar sale of JDAMs and related support to Israel.[74]

127. In December, 2025, the US likewise awarded a contract for roughly $8.58 billion to Boeing for FMS sales through the "F-15 Israeli Program," running now through the end of 2035.[75]

---

[69] US clears $20.3bn in delayed military sales to Israel amid tensions - Airforce Technology
[70] Defense Security Cooperation Agency
[71] Contracts For Dec. 29, 2025 > US Department of War > Contract | US Department of War
[72] Israel – Munitions, Guidance Kits, Fuzes, and Munitions Support > Defense Security Cooperation Agency > Article Display | Defense Security Cooperation Agency
[73] Israel – Munitions, Guidance Kits, and Munitions Support > Defense Security Cooperation Agency > Article Display | Defense Security Cooperation Agency
[74] Israel – Munitions Guidance Kits and Munitions Support > Defense Security Cooperation Agency > Article Display | Defense Security Cooperation Agency
[75] US Awards Boeing an $8.58 Billion Contract to Israel: Here's Who Pays, and How

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

128. On January 30, 2026, Boeing and codefendant Lockheed became principal contractors for a $3.8bn sale of Apache helicopters and related support to Israel. [76]

129. On March 11, 2026, Boeing agreed to a $289 mn direct sale of 5,000 SDBs and related support to Israel. This support and provisioning may take up to three years.[77]

130. All of the above Boeing-manufactured instrumentalities are among those which have been used by the Israeli military in connection with the commission of GVHRs and the attacks that have harmed Plaintiffs.

131. Boeing refueling aircraft are on video over Lebanese air space performing aerial refueling (for jets manufactured by codefendant Lockheed) shortly after completing the heavy pre-emptive strikes of August 25, 2025.[78], [79]

132. Boeing's JDAM kits have been and are still being used in attacks throughout Lebanon. Upon information and belief, they are a critical component of virtually all of the IAF's air-to-ground strikes in Lebanon.

---

[76] Israel – AH-64E Apache Helicopters > Defense Security Cooperation Agency > Article Display | Defense Security Cooperation Agency
[77] Boeing Secures $289 Million Direct Commercial Sale to Supply 5,000 GBU-39 Small Diameter Bombs to Israel- The Defense News; Boeing signs $289 million Israel contract for 5,000 smart bombs, source says | Reuters
[78] Key Insights from The Video Of The Israeli F-35I Adir Refueling Over Lebanon - The Aviationist
[79] CBP-10108.pdf; Mapping the 25 August Israel and Hezbollah attacks | ACLED Insight | ACLED

133.  Boeing-manufactured JDAM kits have been confirmed to have been used in Israeli strikes that killed seven health aide workers in March of 2024, in what multiple human rights organizations decried as a violation of international law.[80]

134.  Israel's September 27, 2024 attack (the Nasrallah strike) in urban Beirut used between 60 to 80 "bunker buster" bombs augmented by Boeing-manufactured JDAM kits, a quantity which Commander Graham Scarbro, writing for the US Naval Institute, observed "might raise some eyebrows."[81] By comparison, the US Air Force expended a total of only 24 such bombs in the entire conflict against the Iraqi military – Israel dropped three times that amount in one night in Beir. In the Commander's experience, the strike "seems like it might be overkill," and is explained by Israel's "more permissive rules of engagement," which have a "higher threshold for collateral damage [. . .] even when chances are higher for civilian casualties." *Id*.

135.  Human Rights Watch and a former US military explosives expert conducted analysis on shrapnel remnants in October 2024 strikes in civilian-dense central Beirut showing the destruction was caused by bombs with JDAM kits manufactured by Boeing.[82] The strikes killed three journalists and injured four

---

[80] Israeli airstrike that killed seven health workers in Lebanon used US munition, analysis reveals | Lebanon | The Guardian

[81] A Closer Look at Israel's Use of 80 Bunker-Buster JDAMs in Beirut | Proceedings - October 2024 Vol. 150/10/1,460

[82] Israel Used US-Supplied Bomb in Beirut Strike That Killed at Least 22 Lebanese | Common Dreams; US-made munition used in Israeli strike on central Beirut, shrapnel shows | Lebanon | The Guardian; Lebanon: US Arms Used in Israeli Strike on Journalists | Human Rights Watch

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

others in what Human Rights Watch described as "most likely a deliberate attack on civilians and an apparent war crime."

136.  On August 6, 2025, IAF strikes targeted and destroyed reconstruction machinery (while killing a Syrian worker and injuring one woman, as well as destroying personal vehicles and homes) which were being rented out to remove rubble from destroyed villages. The strike was part of a pattern of strikes the Human Rights Watch has described as "apparent war crimes."[83] Subsequent investigation found the remnants of a Boeing-manufactured JDAM on the site. Weapon remnants consistent with Boeing JDAM guidance kits were also found at the site of similar strikes on October 11, 2025, which destroyed hundreds of reconstruction machines, killed one, and injured seven.

137.  Boeing-manufactured GBU-39 SDBs were confirmed to be used as "glide bombs" (bombs which deploy wings and glide after launch, allowing the launching aircraft to remain out of range) in a strike in the Harat Hreik district in November, 2025.[84]

138.  Air-to-ground missiles are a core component of Israeli airstrikes.

139.  Upon information and belief, Boeing is the sole supplier of JDAM kits to Israel. Upon information and belief, the IAF relies almost entirely on US-made bombs and JDAM kits, to the point of raising operational concerns when

---

[83] Lebanon: Israel Unlawfully Destroying Reconstruction Equipment | Human Rights Watch
[84] US urges Lebanon to return undetonated GBU-39 | The Jerusalem Post

deliveries from the US are simply delayed, let alone suspended or ceased entirely.[85]

140. Boeing entrusted (and continues to entrust) instrumentalities to Israel when it knew or should have known that they were using them in a manner involving unreasonable risk of harm and in clear violation of human rights and international law.

### Defendant The Lockheed Martin Corporation

141. Lockheed supplies most of Israel's advanced aircraft platforms for its F-35 and F-16 fleets. Lockheed also provides mission-critical support, software, training, maintenance, and components to Israel's missile systems and joint platforms such as Apache systems.[86] Lockheed has provided over 100 F-16I combat aircraft to Israel as well as the Multiple Launch Rocket System and provides ongoing support for these programs. It has provided at least 36 F-35 stealth fighters to Israel, with an agreement to bring that total to 75 within the coming decade. *Id* These fighters have been and are now being operated by the IAF's 116 Squadron, 117 Squadron, and 140th Squadron out of the Nevatim Air Base near Moshav Nevatim. These fighter jets are the primary platform for the IAF's strike programs against Lebanese targets.

---

[85] See, e.g. Israel's new munitions industry
[86] F-35I Adir: Israel Will Soon Have 75 Stealth Fighters Even America Doesn't Have - The National Interest; Gaza War: Israel Gets New F-35 Fighter Jets From US - Bloomberg

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

142.    On July 31, 2021, Lockheed became the principal contractor for a $3.4bn sale of heavy lift helicopters, engines, machine guns, aircrew and maintenance training, and related support and services, including three years of in-residence support in Israel. [87]

143.    On February 7, 2025, Lockheed became the principal contractor for a $660 mn sale of air-to-ground missiles and related software, parts, and support to Israel. [88]

144.    On January 30, 2026, Lockheed and codefendant Boeing became principal contractors for a $3.8bn sale of Apache helicopters and related support to Israel. [89]

145.    Upon information and belief, Lockheed's material support for Israel expands well beyond publicly-available FMS deals, and encompasses the provision of multi-role fighter aircraft, air-to-ground missiles, helicopters, related parts, and training, research assistance, software support, and more.

146.    Lockheed has also invested over $4bn into Israeli defense and aerospace industries, more than $470mn of which took place in the past five years, pursuant to an Umbrella Industrial Cooperation Agreement (UICA).[90]

---

[87] Microsoft Word - Draft Press Release - Israel 21-52 CN Revised
[88] Israel – AGM-114 Hellfire Missiles > Defense Security Cooperation Agency > Article Display | Defense Security Cooperation Agency
[89] Israel – AH-64E Apache Helicopters > Defense Security Cooperation Agency > Article Display | Defense Security Cooperation Agency
[90] Lockheed Martin extends cooperation with Israel | Israel National News

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

147. The F-35 and F-35I aircraft supplied by Lockheed have specifically been used to carry out the bombing and airstrike attacks in Lebanon that have resulted in damage to the life and property of the Plaintiffs.[91] The Lockheed F-35I model was photographed with underwing pylons on the day of the August 25, 2024 air raid, indicating that it was armed with external weapons at the start of the mission. The underwing pylons of the Lockheed-supplied F-35I are routinely mounted with Boeing-supplied JDAM-equipped bombs, and the IAF has specifically mentioned and confirmed use of the Lockheed F-35I in videos of the aircraft refueling over Lebanese airspace. IAF Commander Amikam Norkin has emphasized the ongoing operational use of the F-35I in Lebanon and offered an image showing the F-35I flying in Lebanese airspace over Beirut.[92]

148. The F-35Is are actively used and critical in carrying out attacks on ground targets in Lebanon.

149. F-16, F-35, and F-35I fighter jets are the primary strike platforms the IAF uses in Lebanon, and are the aircraft tasked with carrying JDAM bombs and other munitions produced and supplied by codefendant Boeing. In addition to serving as the primary strike platforms for the IAF's attacks on Lebanese targets, these

---

[91] Key Insights from The Video Of The Israeli F-35I Adir Refueling Over Lebanon - The Aviationist
[92] Everything We Know (And Don't Know) About Israel Launching World's First Air Strikes Using The F-35 Stealth Aircraft - The Aviationist; With Iran in Syria, Israel Launched World's First Air Strike Using F-35 Stealth Fighters

jets provide other mission-critical support by securing air supremacy, gathering intelligence, performing reconnaissance, etc.

150.  Most, if not all, of the IAF airstrikes in Lebanon, have depended upon the use of Lockheed instrumentalities such as multi-role fighter aircraft, air-to-ground missiles, helicopters, maintenance, software support, and training or other support from Lockheed employees.

151.  Lockheed has already supplied much of the IAF's strike fleet, with a contractual commitment to supply more annually through at least 2028.[93]

152.  Entrustment of Lockheed fighter jets and missiles is not a simple "one and done" matter. The fighters are extremely complicated, technologically complex systems which require ongoing maintenance, updates, training, equipment, and support from Lockheed to remain viable for active use.

153.  Lockheed entrusted (and continues to entrust) instrumentalities to when it knew or should have known that they were using them in a manner involving unreasonable risk of harm.

### Defendant Caterpillar, Inc.

154.  Caterpillar has long provided bulldozers and similar heavy machinery along with parts and related support to Israel's IDF.

---

[93] F-35I Adir: Israel Will Soon Have 75 Stealth Fighters Even America Doesn't Have - The National Interest

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

155. On February 28, 2025, Caterpillar became the principal contractor of a $295 million sale of D9R and D9T bulldozers, parts, and related support to Israel, under the US Foreign Military Sales" ("FMS") program. [94, 95]

156. The IDF then outfits and uses Caterpillar machines for a variety of purposes, including tunnel closure, route clearance, and mine disarmament, but also to demolish civilian homes, to violate United Nations-erected treaty walls, to threaten and kill civilians, and to destroy civilian infrastructure in connection with concerning GVHR incidents detailed below. *Id*.

157. In addition to and in furtherance of its FMS transfers, Caterpillar sells to Zoko Enterprises (a/k/a "Zoko Caterpillar"), Caterpillar's exclusive Israeli dealer, who then also modifies, armors, and militarizes the dozers for IDF use. Members of the IDF often serve as technicians for Zoko. Caterpillar works directly with Zoko and the IDF to provide parts, technical documentation, and training, in addition to the heavy machines themselves, making it a critical strategic partner to the IDF ground forces. Upon information or belief, not all sales from Caterpillar to Zoko are public, making it hard to numerically quantify the exact extent of support without discovery.

---

[94] Israel – Caterpillar D9 Bulldozers > Defense Security Cooperation Agency > Article Display | Defense Security Cooperation Agency
[95] Defense Security Cooperation Agency

158. Caterpillar is fully aware of entrustee Israel's manner of using its instrumentalities in a manner involving unreasonable risk of harm. In 2003, the IDF used a Caterpillar bulldozer to crush American peace activist Rachel Corrie to death. [96] In Gaza, the IDF uses them to attack unarmed protestors, to systematically demolish and raze Palestinian homes, public buildings, and civilian infrastructure, including water pipes needed for survival, roads, and agriculture, in violation of the laws of war, going back as early as 2004.[97]

159. In 2010, Amnesty International documented Caterpillar's role in effectuating GVHRs in that region.[98] "CAT equipment has been used to uproot olive trees and destroy other agricultural products and land. During 'Operation Cast Lead' in the Gaza Strip two years ago, Israel used armored D9 bulldozers to demolish wide swathes of homes, factories, agricultural land and civilian infrastructure, including water pipes and networks needed for basic survival." *Id*.

160. The IDF has also used Caterpillar's bulldozers to roll boulders at speed towards protestors, including young children, in 2020.[99]

161. They are used in connection with the "pressure cooker" technique, in which a bulldozer initially shakes the house in which a hold-out is taking refuge, then

---

[96] Rachel Corrie death: struggle for justice culminates in Israeli court | Rachel Corrie | The Guardian; Corrie v Caterpillar, Inc, 503 F3d 974, 978 (CA 9, 2007).
[97] Israel: Caterpillar Should Suspend Bulldozer Sales | Human Rights Watch
[98] Caterpillar Inc's Role in Human Rights Violations in the Occupied Palestinian Territories | Amnesty International USA
[99] Army bulldozer pushes boulders at high speed towards protesters, Kafr Qadum, 21 Feb. 2020 | B'Tselem

**53 |** P a g e

starts peeling off the walls of the floor in which the suspect is located, escalating up to the point of destroying the house and burying the suspect beneath it.[100]

162. Since April 1, 2024, in Lebanon, as documented above, the IDF uses Caterpillar machines to demolish entire towns and villages wholesale, tens of thousands of homes, cemeteries, places of worship, and so on. They are used for the construction of occupier settlements, and the erection of separation barriers to bar landowners indefinitely from re-entry.

163. In 2025, the IDF's unlawful use of these Caterpillar dozers accelerated. Use of such equipment in the wholesale destruction of Lebanese towns and villages, including homes, cemeteries, schools, mosques, hospitals, soccer fields, and agricultural land, is documented in Amnesty International's extensive briefing referenced above.[101] The effort to demolish and raze these homes and to indefinitely displace their lawful owners is being intentionally accelerated by Israeli military leadership, as also noted above.

164. The IDF also uses the Caterpillar D9 bulldzer to breach and destroy barricades erected by the United Nations Interim Force in Lebanon ("UNIFIL"). In October of 2024, the IDF used such tractors to break through UNIFIL "T-walls," paving the way for Israeli tanks to punch through and fire upon a UN observation tower

---

[100] The Ghost Warriors: Inside Israel's Undercover War Against Suicide Terrorism - Samuel M. Katz - Google Books
[101] 25.08.26 BRIEFING ISRAELI DESTRUCTION LEBANON.pdf

**54** | P a g e

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

in an attack the UN condemned as a "grave violation of international humanitarian law."[102]

165. This context helps explain why the Biden administration felt pressured to ultimately block the sale of D9 bulldozers from Caterpillar to Israel in 2023. The critical importance of this equipment to Israel is underscored by the fact that it pursued this acquisition through an "urgent procurement" process.[103] The Trump administration reversed course on this, and Caterpillar happily agreed to the $295 million sale in early 2025, notwithstanding awareness of the way its dozers had been used, were being used, and were foreseeably likely to be used, notwithstanding the fact that it had suspended operations in Russia over less alarming concerns in 2022, and notwithstanding multiple consecutive years of shareholder resolutions and institutional investors calling for more serious human rights due diligence. *Id*.

166. In August, 2025, Norway's $2 trillion sovereign wealth fund divested from Caterpillar due to "unacceptable risk" that its bulldozer provisions "contribute to serious violations of the rights of individuals in situations of war and conflict."[104]

---

[102] Lebanon war: Meet IDF's Caterpillar D9, the most armoured bulldozer in the world as per Guinness Book- The Week
[103] Israel halting export of tanks, rebuilding armored forces amid Gaza war | Ctech
[104] Norway wealth fund divests from Caterpillar, 5 Israeli banks over Gaza 'rights violations' | The Times of Israel

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

167. According to the fund's Council on Ethics, "there is no doubt that Caterpillar's products are being used to commit extensive and systematic violations of international humanitarian law." *Id*.

168. This decision followed that of the nation's largest pension fund, KLP, which had cut ties with Caterpillar for the same reason in 2024.[105]

169. Caterpillar knew of these GVHRs and took no action to discourage them.

170. Caterpillar bulldozers have been and are being used in the construction of an unlawful wall in Southern Lebanon, to permanently or semi-permanently displace the Lebanese citizens who lived at or behind the wall.[106]

171. Caterpillar entrusted (and continues to entrust) instrumentalities to Israel when it knew or should have known that they were using them in a manner involving unreasonable risk of harm.

## CLASS ACTION ALLEGATIONS

172. Plaintiff ACRL and the individually named plaintiffs bring this action on their own behalf and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23 and LCvR 23.1.

173. The PROPOSED CLASS includes:

All United States citizen or lawful permanent residents who held title to property, real or personal, in Lebanon since April 1, 2024; And that

---

[105] I/OPT: Norway's largest pension fund KLP cuts ties with Caterpillar over contribution to illegal settlements & alleged use of equipment by IDF in war on Gaza - Business and Human Rights Centre

[106] Lebanon: Israel Unlawfully Destroying Reconstruction Equipment | Human Rights Watch

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

military activity by the Israeli Defense Force ("IDF") and/or the Israeli Air Force ("IAF") resulted in the destruction of and/or displacement from the property.[107]

174. The above-described class includes all of the named individual plaintiffs and an estimated tens of thousands more, and so, is so numerous that joinder of all members is impracticable.

175. Questions of law or fact common to the class include, but are not necessarily limited to:

a. Has the United States government acted arbitrarily and capriciously, in violation of the Administrative Procedure Act, in refusing to enforce the Leahy Law with regard to Israel?

b. Have the private defendants (Boeing, Lockheed, Caterpillar) acted negligently, in their supplying of Israel with the means of destruction which it has then used to commit the GVHRs and other injuries to plaintiffs?

176. Because the proposed class is defined, in part, by the type and location of injury sustained, the claims of the representative parties are typical of the claims of the class.

177. Because the proposed class is so specific, the representative parties will fairly and adequately protect the interests of the class.

---

[107] This definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

178.   Specifically, this action is properly maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1), as inconsistent or varying adjudications with respect to individual class members would establish incompatible standards of conduct for the defendants and adjudications with respect to individual class members, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications.

179.   Simultaneously or in the alternative, this action is properly maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(3), as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

### COUNT I
**Substantive failure to apply the
Leahy Law (5 USC § 706(2)(A))**
(*As to United States Secretary of State*)

180.   Plaintiffs incorporate the rest of this complaint by reference.

181.   The Leahy Law prohibits the provision of US security assistance to foreign security force units for which there is credible information of involvement in gross violations of human rights.

182.   Despite credible information of gross violations by Israeli security force units, Defendant has failed to find any Israeli unit ineligible for US assistance or to prohibit any Israeli unit from receiving such assistance.

58 | Page

183. Defendant's actions and omissions undermine the plain language and purpose of the Leahy Law, which is designed to prevent US complicity in human rights abuses and to encourage accountability for violations.

184. This failure constitutes final agency action that is arbitrary, capricious, and not in accordance with law under 5 USC. § 706(2)(A).

## COUNT II
### Arbitrary and capricious procedures under the Administrative Procedure Act (5 USC. § 706(2)(A))
### (*As to United States Secretary of State*)

185. Plaintiffs incorporate the rest of this complaint by reference.

186. The ILVF, established by Defendant to vet Israeli military units for compliance with the Leahy Law, imposes uniquely onerous, prolonged, and senior-level processes that are not applied to other countries and are designed to create a de facto exemption of Israel from the Leahy Law.

187. These procedures include excessive delays, diplomatic consultations, and an unreasonably demanding threshold for credible information that contradicts the undemanding standard required by the Leahy Law. It also includes time periods and determinations of remediation that are unique to Israel and significantly depart from the remediation required by the Leahy Law and demanded from other countries receiving US aid.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

188. The ILVF process frustrates the enforcement of the Leahy Law and creates an insurmountable barrier to disqualifying Israeli units, rendering it arbitrary, capricious, and contrary to law under 5 USC. § 706(2)(A).

## COUNT III
### Failure to perform non-discretionary duties under the Leahy Law (5 USC. § 706(1))
***(As to United States Secretary of State)***

189. Plaintiffs incorporate by reference paragraphs 1 through 168 as if fully set forth herein.

190. Pursuant to the Leahy Law, as amended, the Secretary of State has mandatory, non-discretionary duties, including:

   a. Identifying and disqualifying foreign military units credibly implicated in GVHRs that the foreign country has not effectively remediated from receiving US military assistance in advance of providing such assistance;

   b. Providing the relevant foreign governments, including the Government of Israel, with a list of such disqualified units; and

   c. Obtaining written assurances from the foreign governments, including the Government of Israel, that these disqualified units will not receive US security assistance.

191. Defendant has failed to fulfill these statutory duties with respect to Israeli military units, despite substantial credible evidence that many such units have engaged in unremediated GVHRs. The ILVF has been meeting since 2020 and

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

has failed to identify a single ineligible Israeli unit in over five years, while the State Department's own OIG found 'many hundreds' of potential violations requiring 'multiple years' of review. The State Department successfully vets approximately 200,000 units annually for other countries at the working level.

192. This failure constitutes agency action unlawfully withheld or unreasonably delayed, in violation of 5 USC. § 706(1). Under Telecommunications Research & Action Center v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984), agency delay is unreasonable where Congress has indicated urgency, human health and welfare are at stake, and the agency offers no rational justification. See also In re Core Communications, Inc., 531 F.3d 849, 855 (D.C. Cir. 2008) (granting mandamus where six-year agency delay 'effectively nullified' a prior determination); Public Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1157 (D.C. Cir. 1983) (delay unreasonable where life and health interests at stake).

### COUNT IV
### Violation of the Equal Protection Component of the Fifth Amendment
### (*As to United States Secretary of State*)

193. Plaintiffs incorporate the above allegations by reference.

194. The Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the federal government from intentionally denying equal protection of the laws to persons within its jurisdiction.

195. Plaintiffs are United States citizens and Lawful Permanent Residents.

196. Plaintiffs are of Lebanese ancestry and own property located in Lebanon.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

197. Since at least April 1, 2024, units of the Israeli security forces have committed Gross Violations of Human Rights in Lebanon within the meaning of the Leahy Laws.

198. Defendants have possessed credible information concerning such violations through diplomatic reporting, intelligence reporting, public reporting, reports of international organizations, reports of nongovernmental organizations, and other information available to the Executive Branch.

199. Upon information and belief, Defendants have previously suspended or restricted security assistance to foreign military units in other countries pursuant to the Leahy Laws based upon evidence that was comparable to, or less substantial than, the evidence available concerning Israeli security-force units.

200. Notwithstanding that evidence, Defendants have continued to authorize, facilitate, or decline to suspend military assistance to Israeli security-force units injuring Plaintiffs.

201. Defendant's selective enforcement of the Leahy Laws has denied Plaintiffs the equal protection of the laws guaranteed by the Fifth Amendment.

202. Defendant's selective non-enforcement has foreseeably increased the risk that US citizens and LPRs of Lebanese ancestry—including Plaintiffs—would suffer death, bodily injury, and destruction of property in Lebanon.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

203. Plaintiffs have suffered concrete injuries, including destruction of property, displacement, and related economic losses, as a direct and foreseeable consequence of Defendants' unequal administration of federal law.

204. Defendant State has intentionally administered the Leahy Laws in a discriminatory manner by declining to apply statutory restrictions to Israeli security-force units while applying those restrictions to similarly situated foreign security-force units.

205. Defendant State's unequal administration of federal law lacks a constitutionally sufficient justification and violates the equal protection component of the Fifth Amendment.

**COUNT V**
**(*Michigan Cause of Action*)**
**Negligent Entrustment**
**(*As to the Private Defendants*)**

206. Plaintiffs incorporate the above allegations by reference.

207. The contracts of concern for this complaint are those contracts which contemplate a date or dates of execution, payment, renewal or optional renewal, extension or optional extension, performance or partial performance, delivery or partial delivery, fulfilment, obligation, or any other material term after April 1, 2024, entered into by a named Defendant or its agent or subsidiary, for the eventual provision of munitions, machinery, defense articles, software, training, or other services or instrumentalities, to the State of Israel, the Israeli Defense

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

Force, the Israeli Air Force, or their constituent agents, units, or representatives (henceforth, "relevant contracts").

208.   At the time of entering into each relevant contract, each defendant had both actual and constructive knowledge that Israeli entrustees had been using its articles and services in a manner involving an unreasonable risk of physical harm to the person and property of others.

209.   At the time of entering into each relevant contract, each defendant had both actual and constructive knowledge that Israeli entrustees were ongoingly using its articles and services in an ongoing manner which involved an unreasonable risk of physical harm to the person and property of others.

210.   At the time of entering into each relevant contract, each defendant had both actual and constructive knowledge that Israeli entrustees would continue using its articles and services in a manner involving an unreasonable risk of physical harm to the person and property of others.

211.   The actual and constructive knowledge of defendants described in the above three points extends to the time of each instance of each defendants' performance, partial, full, or ongoing, on each relevant contract.

212.   The official findings of international human rights groups and the arrest warrants by the International Criminal Court for Israeli Prime Minister Benjamin Netanyahu and former Israeli Defense Minister Yoav Gallant, for war crimes and crimes against humanity, and the other above-referenced evidence and

information concerning GVHRs in both Lebanon and Gaza are and have been a matter of public information and considerable public interest.

213. The above-referenced evidence and information directly link instrumentalities provided by Defendants under the relevant contracts to Israel's use of said instrumentalities in connection with the commission of GVHRs.

214. Such information was or should have been known to defendants.

215. Such information and concerns about the information were directly brought to defendants' attention by shareholders, employees, and institutional investors, through shareholder resolutions and statements, protests, grievances, complaints, internal ethics boards inquiries, risk departments, and divestment decisions.

216. No Defendant can therefore deny that it had knowledge of information that the Israeli military was using its articles to commit violations of human rights against persons and property in Lebanon.

217. Each Defendant knew or should have known that Israeli entrustees were using the instrumentalities in a manner involving an unreasonable risk of physical harm to the person and property of others.

218. Israeli entrustees did in fact operate the instrumentalities in a manner involving an unreasonable risk of physical harm to the person and property of Plaintiffs.

219. Defendants did not undertake to pause or suspend transfers in light of what they knew, or to otherwise mitigate the known risk associated with their transfer.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

220. This risk was the actual and proximate cause of Plaintiffs' injuries.

**COUNT VI**
**(*Michigan Cause of Action*)**
**Negligence**
**(*As to the Private Defendants*)**

221. Plaintiffs incorporate the above allegations by reference.

222. Defendants owe a duty of care not to entrust instrumentalities to entrustees who they know will use them in a manner involving an unreasonable risk of harm to the person and property of US citizens and LPRs.

223. Defendants violated this duty in their entrustment of instrumentalities to Israeli military unit, whose manner of use caused physical harm to the person and property of plaintiffs.

**COUNT VII**
**(*Michigan Cause of Action*)**
**Gross Negligence (MCL 691.1407)**
**(*As to the Private Defendants*)**

224. Plaintiffs incorporate and reallege above by reference.

225. Defendants had actual knowledge of the manner in which their instrumentalities were being used and continued to transfer them anyways.

226. Defendants took no meaningful effort to stop, suspend, or refuse transfers.

227. Defendants behaved, at absolute best, with an attitude of utter indifference to the fact that the instrumentalities they conveyed to Israeli military units were being used to effectuate GVHRS and to unlawfully deprive United States citizens and LPRs of property and businesses.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

228. This indifference surpasses the standard required for gross negligence, and such negligence proximately and actually caused the attacks which caused Plaintiffs' injuries.

## COUNT VIII
### (*Michigan Cause of Action*)
### Willful and Wanton Misconduct
### (*As to Private Defendants*)

229. Plaintiffs incorporate and reallege above by reference.

230. Defendants knew of the unreasonable risk of injury to plaintiffs, which could have been avoided by the exercise of ordinary care and diligence;

231. Defendants (and Defendants alone) had the ability to avoid the harm by suspending the relevant contracts, declining to fulfill them, voiding them, or conditioning further performance on terms that would have avoided the injuries.

232. Defendants omitted to use any care or undertake and due diligence to avert the risk. To the contrary, they actively facilitated it.

## COUNT IX
### (*Michigan Cause of Action*)
### Intentional Infliction of Emotional Distress
### (*As to Private Defendants*)

233. Plaintiffs incorporate the above allegations by reference.

234. Defendants' conduct in knowingly facilitating the targeting and destruction of the families and homes of US citizen taxpayers, effectively forcing them to participate in and finance their own destruction, at the hands of foreign military units actively engaging in GVHRs, was extreme and outrageous.

**67** | P a g e

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F.: (313) 983-4665

235. This behavior was especially outrageous given the sheer extent of evidence for the entrustee's past, present, and planned future wrongdoing, and that Defendants' complicity enabled atrocities and mass violence against citizens.

236. Defendants' conduct was knowing and intentional, as discussed above in some detail. Upon information and belief, not only did Defendants ignore the known risk of targeting and destroying US citizen and LPR persons and property – they actively encouraged it through lobbying efforts and corporate board meetings which interpreted the war in Lebanon and Palestine as a lucrative business opportunity.

237. As discussed above, Defendants' conduct in entrusting instrumentalities of war was the actual and proximate cause of each plaintiff's injuries.

238. Defendants cannot plead that Israeli military action was somehow an intervening cause of the plaintiffs' harm when Israeli violence against plaintiffs was precisely the risk foreseeably caused and created by Defendants' entrustment.

239. Plaintiffs have suffered and continue to suffer severe emotional distress. They have seen friends and families injured and displaced from ancestral lands. They have been displaced and indefinitely deprived of an opportunity to return to their homes, to land they legally own, under threat of death from attacks carried out by Defendant-armed militaries in contravention of international and humanitarian law. They are being forced to pay taxes to finance the wholesale

destruction of their homes and homelands and the annihilation of their friends and families with no other redress.

**COUNT X**
(***Michigan Cause of Action***)
**Aiding and Abetting of Trespass to Land**
(***As to Private Defendants***)

240. Plaintiffs incorporate the above allegations by reference.

241. Michigan law recognizes trespass to land where a party damages or destroys real property or structures affixed to it. Aiding and abetting liability for this claim exists where:

   a. Defendants knew that the primary party's conduct constituted a breach of duty, and

   b. Defendants gave substantial assistance or encouragement to the primary party in carrying out the tortious act. *El Camino Resources Ltd. V. Huntington Nat. Bank*, 712 F.3d 917 (2013).

242. Defendants had actual and constructive knowledge of Israel's conduct in destroying civilian homes in Lebanon, razing territory, and displacing residents. Public warnings were issued by UN experts directly naming Boeing, Lockheed, and Caterpillar, warning about complicity in crimes against humanity.[108] **The UN experts provided defendants with direct allegations but received no response.**

---

[108] See, e.g. Arms manufacturers and complicity in crimes against humanity in Gaza - Business and Human Rights Centre; I/OPT: Experts call on arms manufacturers & investors to end the

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

243. **Amnesty International's 2025 global briefing explicitly names Boeing and Lockheed Martin as companies for which it has credible evidence of contributing substantially to unlawful Israeli actions of expropriation and structural destruction.[109]**

244. **Caterpillar was the named defendant in the 2003 case in which the IDF crushed American Rachel Corrie to death using a D9 dozer as she peacefully protested the demolition of Palestinian homes in Rafah.**

245. **Each defendant corporation has a code of conduct, a human-rights policy, and a board-level ethics/compliance or ESG-style committee tasked with gathering information about precisely these issues and assessing compliance.**

246. **Upon information and belief, institutional investors, activists, and/or shareholder resolutions have raised inquiries to defendants concerning certain sales to Israel and/or on the basis of concern that goods sold may be used to harm the persons and property of others in violation of human rights and/or international law.**

247. **The provision of these instrumentalities with foreknowledge of their intended and ongoing use in a trespassory way qualifies as "substantial assistance."**

---

transfer of arms to Israel while media & civil society allege companies' involvement in the war on Gaza - Business and Human Rights Centre

[109] Above. See also Global complicity, UK involvement: Profiting from atrocity and enabling Israel's genocide and apartheid – new briefing | Amnesty International UK

## COUNT XI
### Injunctive Relief
**(*As to all defendants*)**

248.   Plaintiffs incorporate the above allegations by reference.

249.   Plaintiffs have suffered, and absent judicial intervention will continue to suffer, immediate and irreparable injury.

250.   Monetary damages cannot adequately remedy Plaintiffs' injuries because the challenged conduct threatens continuing loss of life, bodily injury, destruction of property, and deprivation of constitutional and statutory rights.

251.   Defendants' continuing conduct is unlawful for the reasons alleged in the preceding Counts.

252.   The balance of equities favors Plaintiffs because the requested injunction would require only that Defendants comply with governing federal law.

253.   The public interest is served by requiring federal officials to comply with statutes enacted by Congress and with the Constitution.

## COUNT XII
### Declaratory Relief (28 USC §§ 2201–2202)
**(*As to all defendants*)**

254.   Plaintiffs incorporate the above allegations by reference.

255.   An actual and justiciable controversy exists between Plaintiffs and Defendants regarding Defendant State's interpretation and enforcement of the Leahy Laws and continuing authorization or facilitation of security assistance to Israeli

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

security-force units, and the Private Defendants' continued injury to Plaintiffs' as described within this complaint.

256.   Plaintiffs contend that Defendants have acted contrary to federal law by continuing to furnish, authorize, or facilitate security assistance to Israeli security-force units despite credible information that such units have committed Gross Violations of Human Rights.

257.   Plaintiffs further contend that Defendants' actions violate the Administrative Procedure Act and the equal protection component of the Fifth Amendment for the reasons set forth in the preceding Counts.

258.   Defendants dispute these contentions and continue to authorize or permit such assistance.

259.   The controversy is immediate, concrete, and ripe for judicial determination because Defendants continue to implement the challenged policies and Plaintiffs continue to suffer ongoing and threatened injury.

260.   A judicial declaration will terminate the controversy and clarify the respective rights and obligations of the parties.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request entry of judgment against Defendants on all counts, and grant relief as follows:

**72** | P a g e

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

a. Issue a declaration that Defendants entrusted instrumentalities to the state of Israel when they knew or should have known that Israel was using them to commit gross violations of human rights;

b. Issue a temporary injunction halting the transfer of further instrumentalities by Defendants to Israel, including the ongoing provision of technical, software, parts, and maintenance support, which is enabling the indefinite exacerbation of harm against them and their land;

c. Issue a permanent injunction barring transfer of instrumentalities by Defendants to Israel unless and until plaintiffs' access to and use of their property has been entirely restored, they have been made financially whole for the harms already suffered, and Defendants have established that there is no longer an unreasonable risk of harm to the persons or property of the plaintiffs and that there is no longer an unreasonable risk of enabling the commission of GVHRs, by such entrustment;

d. Award monetary damages for:

   i. Destruction of structural property and diminishment of value;

   ii. Expropriation of and trespass upon land and the indefinite lost use and enjoyment of same;

   iii. With respect to plaintiffs whose business operations and employment were disrupted, lost wages and earnings;

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

iv. Compensation for mental and emotional pain and suffering, and physical suffering and loss of consortium where applicable;

e. Attorney's fees

f. Costs

g. Such other relief as the Court deems just and equitable

[*Signatures on following page.*]

**AYAD LAW, P.L.L.C.**
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

Respectfully submitted,

AYAD LAW, PLLC

*/s/Nabih H. Ayad*
Nabih H. Ayad (P59518)
William D. Savage (P82146)
Keegan J. McCorry (P86757)
AYAD LAW, PLLC
*Attorneys for Plaintiff ACRL*
645 Griswold St., Ste. 2202
Detroit, MI 48226
P: 313.983.4600 | F: 313.983.4665
filing@ayadlawpllc.com

James Allen
211 West Fort Street
Suite 1410
Detroit, MI 48226
P: 313.774.1000, 1003
james.allen@sbdetroit.com

Amer Zahr (P85113)
20924 Outer Drive
Dearborn, MI 48124-2762
P: 734.945.4575
amer@amerzahr.com

Jerome D. Goldberg P61678)
JEROME D. GOLDBERG, PLLC
2727 Second Avenue, Ste. G06
Detroit, MI 48201
P: 313.319.0870

Dated: August 11, 2026          apclawyer@sbcglobal.net

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all of the counts raised in this complaint.

Respectfully submitted,

AYAD LAW, PLLC

*/s/Nabih H. Ayad*
Nabih H. Ayad (P59518)
William D. Savage (P82146)
Keegan J. McCorry (P86757)
AYAD LAW, PLLC
645 Griswold St., Ste. 2202
Detroit, MI 48226
P: 313.983.4600 | F: 313.983.4665
filing@ayadlawpllc.com

James Allen
211 West Fort Street
Suite 1410
Detroit, MI 48226
P: 313.774.1000, 1003
james.allen@sbdetroit.com

Amer Zahr (P85113)
20924 Outer Drive
Dearborn, MI 48124-2762
P: 734.945.4575
amer@amerzahr.com

Jerome D. Goldberg P61678)
JEROME D. GOLDBERG, PLLC
2727 Second Avenue, Ste. G06
Detroit, MI 48201
P: 313.319.0870

Dated: August 11, 2026                  apclawyer@sbcglobal.net

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this date I filed the foregoing document and any attachments with the Clerk of Courts *via* the electronic filing system.

Respectfully submitted,

AYAD LAW, PLLC

*/s/Nabih H. Ayad*
Nabih H. Ayad (P59518)
William D. Savage (P82146)
Keegan J. McCorry (P86757)
AYAD LAW, PLLC
645 Griswold St., Ste. 2202
Detroit, MI 48226
P: 313.983.4600 | F: 313.983.4665
filing@ayadlawpllc.com

Dated: August 11, 2026

**AYAD LAW, P.L.L.C.**
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**77** | P a g e

# Attachment A:

# Map of 2026 Israeli Aggression in Lebanon

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665



https://www.nbcnews.com/world/lebanon/israel-issues-new-lebanon-occupation-map-talks-us-deployment-rcna350681